NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JEAN VASADI, et al., individually and on behalf of all others similarly situated, | : | **Civil Action No. 21-10238-WJM-AME** |
| Plaintiffs, | : | |
| v. | : | **OPINION** |
| SAMSUNG ELECTRONICS AMERICA, INC., | : | |
| Defendant. | : | |

**ESPINOSA**, Magistrate Judge

This matter is before the Court on the defendant's motion to compel arbitration and to stay this action, referred for decision by the Honorable William Martini pursuant to 28 U.S.C. § 636(b).[1] Plaintiffs oppose the motion. The Court has reviewed the parties' written submissions and decides the motion without oral argument. *See* Fed. R. Civ. P. 78(b). For the reasons that follow, the motion is granted.

## I. BACKGROUND

### A. Parties and Factual Allegations

This putative class action for consumer fraud and warranty violations arises out of the sale or lease of smartphone products in the "Galaxy S20" model line sold by defendant Samsung

---

[1] The Third Circuit has held that a motion to compel arbitration and stay litigation concerns a non-dispositive matter and may therefore be decided by a magistrate judge. *Virgin Islands Water and Power Auth. v. Gen. Electric Int'l Inc.*, 561 F. App'x 131, 134 (3d Cir. 2014) ("A ruling on a motion to compel arbitration does not dispose of the case, or any claim or defense found therein. Instead, orders granting this type of motion merely suspend the litigation while orders denying it continue the underlying litigation.").

Electronics America, Inc. ("SEA").[2] The named plaintiffs (collectively, "Plaintiffs") consist of twenty individuals, hailing from several different states, who each bought or leased a Galaxy S20 phone.[3] Plaintiffs claim they sustained a loss as a result of SEA's failure to disclose a known defect involving the smartphone's camera.

According to the Amended Complaint, the Galaxy S20 phone features a rear camera module that encases multiple lenses. The phone is "marketed by Samsung as 'The Complete Pro-Grade Camera Solution'" and sells for a "premium price of up to $1,600.00." (Am. Compl. ¶ 1.) Plaintiffs allege they selected the Galaxy S20 phone after reading or viewing SEA's promotional statements about the phone's professional-grade camera. However, they assert that, at the time SEA sold the product, SEA knew the phone's rear camera glass was susceptible to spontaneous shatter and concealed that fact from consumers. Each Plaintiff alleges he or she experienced this product failure, and that the camera module glass in their device cracked or shattered during normal use, without the application of force, or that they discovered a crack in the glass despite no known cause for the break. Plaintiffs allege they paid substantial amounts to buy or lease a phone featuring a high-quality camera that was rendered unusable or at least largely limited in function because of the shattered camera glass.

---

[2] The Amended Complaint lists the various smartphone editions included in the Galaxy S20 line. (See Am. Compl. n. 3.) For simplicity, this Opinion refers to the various specific smartphone products in the Galaxy S20 line at issue as the "Galaxy S20 phone."

[3] Plaintiffs and their respective home states are identified in the Amended Complaint [ECF No. 5], and their identifying information is incorporated herein by reference.

Plaintiffs further allege they would not have selected the Galaxy S20 phone or would not have paid such a high price for a phone had they known about the rear camera spontaneous shatter defect.

**B.      Procedural Background**

This putative nationwide class action was filed on April 27, 2021. The original Complaint asserted claims brought by six named plaintiffs seeking relief under the federal Magnuson Moss Warranty Act, the New Jersey Consumer Fraud Act, and other consumer protection claims. The Amended Complaint was filed on May 27, 2021, naming additional Plaintiffs and pleading for relief under the originally asserted claims as well as statutory claims under the laws of the various Plaintiffs' home states. SEA filed this motion to compel arbitration and stay the litigation on July 12, 2021.

**C.      Notice of Arbitration Agreement**

The basis of SEA's motion is that the purchase and use of the Galaxy S20 phone is subject to certain contractual terms and conditions, including an agreement to submit disputes to arbitration (the "Arbitration Agreement"). SEA asserts it repeatedly provides consumers "conspicuous notice" of the Terms and Conditions, the way in which a consumer expresses acceptance of those terms, and the opportunity to opt out of the Arbitration Agreement.[4] According to SEA, notice of the Arbitration Agreement appears in three different locations: on

---

[4] The factual summary concerning SEA's notice of the Arbitration Agreement is drawn from the Certification of Nicole Cantwell, Senior Manager of Digital Content ("Cantwell Certification"), and the Cantwell Certification's attached exhibits, proffered by SEA in support of its motion to compel arbitration. [ECF No. 8-2 to 8-8]

the product box; in a pamphlet found inside the box; and in the onscreen device setup process.

The Cantwell Certification describes the form and content of the notice in each of those

locations.

        1.   Exterior label of the product box

Galaxy S20 phones sold in the United States are packaged in a box bearing an external

label. Examples of the label are attached to the Cantwell Certification at Exhibit A. While the

examples contain minor variations depending on the mobile carrier through which the phone is

purchased (or, alternatively, purchased as unlocked to a carrier) and also depending on the

particular type of Galaxy S20 phone, the labels begin with an identification of the product name

and model, and then set forth various information, including an express reference to the Terms

and Conditions as well as an express disclosure concerning acceptance of the Arbitration

Agreement. For example, the label for the Galaxy S20 Ultra 5G offered through Verizon states in

bold print, immediately below the product name:

> Packaging Contains:
>
> Samsung Galaxy S20 Ultra 5G, Pre-Installed SIM Card, Wall Charger, Stereo
> Headset, Quick Reference Guide and Terms and Conditions

(Cantwell Cert., Ex. A-1.) Next, after a one-line disclosure concerning the phone's memory, set

forth in regular font, the label states, again in bold:

> IMPORTANT INFORMATION
>
> If you use or retain the device, you accept Samsung's Terms and Conditions, including
> an Arbitration Agreement. Full terms, warranty, and opt-out information are at
> www.samsung.com/us/Legal/Phone-HSGuide/, the enclosed materials & device settings.

(*Id.*)[5]

SEA asserts the label's referenced URL links to a webpage that sets forth the "Terms & Conditions" and makes available the full text of the Arbitration Agreement. According to the Cantwell Certification, prior to March 21, 2021, the webpage was titled "Terms & Conditions/Health & Safety Information" and began with a paragraph stating:

> Read this document before operating the mobile device, accessories or software (defined collectively and individually as the "Product") . . . . Electronic acceptance, opening the Product packaging, use of the Product, or retention of the Product constitutes acceptance of these Terms and Conditions.

(*Id.* ¶ 14 and Ex. B.) The webpage then provided a list of four agreements, led by the Arbitration Agreement." The page made available the full text of the agreement in two ways: by clicking on "Arbitration Agreement" in the list of agreements or by clicking on the same term separately set forth in an active Table of Contents. Scrolling down the page, immediately after the Table of Contents is identified, the website stated:

> Important Legal Information
>
> READ THIS INFORMATION BEFORE USING YOUR MOBILE DEVICE.
>
> Arbitration Agreement – This product is subject to a binding arbitration agreement between you and SAMSUNG ELECTRONICS AMERICA, INC. ("Samsung"). You can opt out of the agreement within 30 calendar days of the first consumer purchase by emailing optout@sea.samsung.com or calling 1-800-SAMSUNG . . . and providing the applicable information. For complete terms and conditions that bind you and Samsung, refer to the "Arbitration Agreement" section of this document.

(*Id.* and Ex. B.)

---

[5] On some variants of the Galaxy S20 phone, for example the Ultra 5G offered through T-Mobile, the "IMPORTANT INFORMATION" section appears towards the middle of the label and provides broader language, stating: "If you *open the package*, use or retain the device, you accept Samsung's Terms and Conditions . . .." (*Id.* Ex. A-2) (emphasis added).

According to the Cantwell Certification, the webpage found at the URL referenced on the box label was modified in March 2021. As of the March 2021 revision, the URL takes users to a site which now begins with the prominent, bold-font language:

> Terms and Conditions. This Product is subject to a binding arbitration agreement between you and [SEA]. You can opt out of the agreement within 30 calendar days of the first consumer purchase (or use of application) by emailing . . . or calling. . .. For complete terms and conditions that bind you and [SEA] refer to the "Arbitration Agreement" section of this document.

(*Id.* ¶ 16, Ex. C.) It then states:

> For specific provisions or legal information relating to your device, please refer to the printed Terms & Conditions included with your device, or visit www.samsung.com and use the model number to locate the support page . . .

(*Id.*) The website provides a four-item list, with clickable bubbles next to each item. The first item is the "Arbitration Agreement," and, according to Cantwell, clicking the bubble next to these words brings the full agreement into view. The website further indicates that the full Arbitration Agreement is available on the device and directs users to the location on the phone where it can be found.

2. Pamphlet inside the product box.

Cantwell asserts each Galaxy S20 phone is packaged in a box containing a six-page pamphlet titled "Terms and Conditions."[6] The cover page of the pamphlet so identifies it with these words printed in large, bold type. (*Id.* ¶ 18-19 and Ex. D.) Immediately below the title, the cover page states:

---

[6] The Terms and Conditions pamphlet included in phones sold through mobile carrier AT&T is fourteen pages long, the Cantwell Certification points out, due to the inclusion of a Spanish translation of the text. (Cantwell Cert. ¶ 19.)

Read this document before operating the mobile device, accessories, or software (defined collectively and individually as the "Product") and keep it for future reference. This document contains important Terms and Conditions. Electronic acceptance, opening the packaging, use, or retention of the Product constitutes acceptance of these Term and Conditions.

(*Id.* ¶ 19-20 and Ex. D.) The first page of the pamphlet sets forth, again in bold print:

## Important legal information

**Arbitration Agreement - This Product is subject to a binding arbitration agreement between you and SAMSUNG ELECTRONICS AMERICA, INC. ("Samsung"). You can opt out of the agreement within 30 calendar days of the first consumer purchase by emailing optout@sea.samsung.com or calling 1-800-SAMSUNG (726-7864) and providing the applicable information.**

The full Arbitration Agreement, Standard One-year Limited Warranty, End User License Agreement (EULA), and Health & Safety Information for your device are available online:

- English: www.samsung.com/us/Legal/Phone-HSGuide
- Spanish: www.samsung.com/us/Legal/Phone-HSGuide-SP

This information can also be found on the device in the "About device" or "About phone" or "About tablet" section, for example:

- **Settings › About phone** or **About device** or **About tablet › Legal information › Samsung legal**
- Or, Search "Legal"

If your device required Federal Communications Commission (FCC) approval, you can view the FCC certification by opening Settings › About phone or About device or About tablet › Status.

(*Id.*)

3.  Onscreen set-up of the device

The Galaxy S20 phone requires completion of an electronic set-up process to activate and start using the phone. The process consists of a series of interactive screens presented on the device. The first screen sets forth a few hyperlinks, the first of which is the "Terms and conditions." A user may access the scrollable terms though the hyperlink. The first term visible is the Arbitration Agreement, set forth in all-capitalized letters. Employing identical language to

the previously quoted physical forms of notification, the onscreen link provides that the Arbitration Agreement is a "binding legal agreement" which will be deemed accepted by the Galaxy S20 user in the same ways as set forth above. Before a user may continue with the device activation and proceed to the next screen, he or she must click on a bubble on the initial set-up screen acknowledging the terms and conditions and click on another bubble further below confirming "I have read and agree to all of the above." (*Id.* ¶ 28 and Ex. E.)[7]

> **D.**     **Terms of the Arbitration Agreement**

The Arbitration Agreement, available in the various locations detailed above, commences: "This is a binding legal agreement ("Agreement") between you (either an individual or entity) and [SEA]." (*Id.*, Ex. B, C, E.) Thereafter, it sets forth various provisions relevant to the motion before the Court. It defines the scope of matters to be submitted to arbitration, providing, in relevant part, that "all disputes between you and Samsung relating in any way . . . to the sale, condition, or performance of the product shall be resolved exclusively through final and binding arbitration, and not by a court or jury." (*Id.*) The Arbitration Agreement further provides: the "arbitration shall be conducted according to the American Arbitration Association Rules applicable to consumer disputes" and the "Agreement is entered into pursuant to the Federal Arbitration Act." (*Id.*) Finally, it expressly provides that the arbitrator "shall decide all issues of interpretation and application" of the Arbitration Agreement. (*Id.*)

---

[7] SEA notes that the Terms and Conditions, including the Arbitration Agreement, may be accessed at any time on the device itself, as indicated on both the paper copy of the in-box pamphlet and on the webpage to which the exterior product label directs consumers.

### E.      Plaintiffs' Awareness of the Arbitration Agreement

As summarized in their opposition brief, Plaintiffs uniformly assert, in their respective declarations, that "they did not encounter an arbitration agreement at any point prior to the cracking of their phone glass." (Opp'n Br. at 7.) In other words, all twenty named Plaintiffs maintain they did not become aware of the Arbitration Agreement at any time before experiencing the alleged product failure giving rise to this lawsuit, in any form the notice was purportedly provided—when they acquired the Galaxy S20 phone in the labeled box, when they opened and/or inspected the product box, or during the phone activation process.

Thirteen of the Plaintiffs state that they did not activate their Galaxy S20 phones themselves, but rather a salesperson at the retailer completed the activation.[8] Each describes a similar experience, in which a salesperson performed the onscreen setup process, clicking through the series of start-up screens, including the first screen requiring the user to acknowledge and agree to terms and conditions. Each asserts the salesperson made no mention of any contractual terms generally, nor the Arbitration Agreement specifically, as they appeared during the device setup. Plaintiff Danielle Moyer's description of this experience typifies that of the others in this group. Moyer states:

> At the time of purchase, my phone was activated for me by a salesperson at the Verizon store. The salesperson went through the setup process on the phone for me. The salesperson never told me about any terms or contracts or any arbitration agreement during the setup process.

(Moyer Decl. ¶ 5.)

---

[8] The retailers are mostly various cellular service carriers, and there is no contention SEA or SEA-affiliated entities participated in the retail sale of the Galaxy S20 phones to Plaintiffs.

Seven Plaintiffs activated their own Galaxy S20 phones but claim they did not see or receive notice of the Arbitration Agreement during that process. Plaintiff Ridge Berry's experience is illustrative:

> I activated the phone myself and went through the setup process. I was never notified of an arbitration agreement during the setup process. I was never notified of and did not know about terms or agreements on Samsung's website.

(Berry Decl. ¶ 5.)

According to the party declarations, none of the Plaintiffs saw any indication of the Arbitration Agreement on the product box or inside the packaging for their Galaxy S20 phones. About half of the Plaintiffs assert that although they did not save their product packaging, they recall not seeing any reference to "Terms and Conditions" either on the exterior label or in a pamphlet. Plaintiff Gordon Friend's statements on this subject are echoed by the other Plaintiffs who discarded their Galaxy S20 packaging materials:

> After I got my Galaxy S20 5G phone, I did not see any print on the packaging or see any papers inside the box. I did not know there was an arbitration agreement referenced in tiny lowercase font on the bottom of the phone box. I am also unaware of any arbitration agreement enclosed inside the Galaxy S20 5G box.

(Friend Decl. ¶ 5.) Others did retain the packaging but assert they only located the in-box Terms and Conditions when directed to it by their legal counsel. They attribute their inability to locate the pamphlet due to its obscure and "hidden" placement within the product box. For example, Anna and Scott King jointly declare:

> We still have the packaging for our Galaxy S20 Ultra. We had no idea there were terms and conditions inside the box until recently. After speaking with our attorney, we located the terms and conditions insider the box the phone came in, hidden underneath the area where the phone charger is, inside a box that was inside a smaller box.

(King Decl. ¶ 10.)

Two of the named Plaintiffs, Amber and Justin O'Connor, had a slightly different experience than the others. Although they assert they did not see or receive notice of any Terms and Conditions associated with their Galaxy S20 at or near the time of purchase, the O'Connors ultimately exercised their right to opt-out of the Arbitration Agreement. According to their joint declaration, the O'Connors received their phones on April 6, 2021 and, within days, noticed the camera glass on one of the phones was cracked. However, they assert they only learned of the Arbitration Agreement after their attorney directed them to it, on or about May 6, 2021. On that date, Amber and Justin O'Connor each "followed the instructions for opting out the agreement online." (O'Connor Decl. ¶ 10.)

## II.    DISCUSSION

### A.    Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., authorizes federal courts to compel arbitration and stay proceedings pending arbitration. The FAA provides that "a written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . .  shall be valid, irrevocable, and enforceable . . . ." 9 U.S.C. § 2. The statute "creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." *Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 522 (3d Cir. 2009). The Third Circuit has long recognized that the FAA represents "a strong federal policy in favor of resolving disputes through arbitration." *Id.* at 523; *see also Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178 (3d Cir. 1999) ("Federal law presumptively favors the enforcement of arbitration agreements."). Indeed, the Supreme Court has held that arbitration agreements covered by the

FAA must be "rigorously enforced." *Perry v. Thomas*, 482 U.S. 483, 490 (1987). Where, as in this case, an arbitration agreement relates to "a transaction involving [interstate] commerce," the agreement falls within the scope of the statute, and the FAA therefore governs. 9 U.S.C. § 2; *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005).

Section 4 of the FAA provides that a party may petition the Court to enforce an arbitration agreement and issue "an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The Third Circuit has articulated a two-step analysis to determine whether to compel the parties to a suit to arbitrate their dispute. *Trippe*, 401 F.3d at 532. First, the Court must determine whether a valid agreement to arbitrate exists, and second, it must evaluate whether the dispute falls within the scope of the agreement. *Id.*; *see also Century Indem.*, 584 F.3d at 523. Because arbitration is treated as an affirmative defense, the burden falls on the party seeking to compel arbitration to establish these requirements. *Noble v. Samsung Elecs. Am., Inc.*, 682 F. App'x 113, 115 (3d Cir. 2017).

Where the arbitrability of claims is apparent from the face of the Complaint, a motion to dismiss standard will apply to the question of whether the movant has met its burden. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013). However, where it is not facially apparent the parties agreed to arbitrate or when one party disputes it is bound by an arbitration agreement, a "restricted inquiry into factual issues will be necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate." *Id.* Accordingly, under such circumstances, a summary judgment standard will apply. *Id.*

### B.      SEA's Motion to Compel Arbitration

This motion to compel arbitration calls for an inquiry of only the first question in the analytical framework. The Supreme Court has held that the second question, whether the dispute falls within the scope of the applicable arbitration agreement, is delegated to the arbitrator if the agreement calls for arbitrability to be decided by the arbitrator. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-44 (1995). Here, as SEA points out, the Arbitration Agreement provides both that "[t]he arbitrator shall decide all issues of interpretation and application of this Agreement" and that the arbitration is subject to the American Arbitration Association Rules. (Cantwell Cert. Ex. C, E.) The Arbitration Agreement both expressly delegates the issue of arbitrability to the arbitrator and accomplishes this result by incorporating the AAA rules, "one of which delegates the gateway issue of arbitrability to the arbitrator." *Carrone v. UnitedHealth Group, Inc.*, No. 20-5138(FLW), 2020 WL 4530032, at *3 (D.N.J. Aug. 6, 2020) (finding agreement's incorporation by reference of AAA rules granted arbitrator power to decide whether dispute was arbitrable, noting numerous courts have so held); *see also Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020) (holding incorporation of AAA Rules into agreement constitutes clear evidence arbitrability is delegated to the arbitrator). The language set forth in the SEA Arbitration Agreement unambiguously delegates the arbitrator the authority to decide issues concerning the interpretation and/or scope of the Arbitration Agreement, a point which is not contested by Plaintiffs in their opposition brief.

Thus, the question for the Court is whether an enforceable agreement to arbitrate exists between the parties. While SEA argues Plaintiffs assented to, and are therefore bound by, the Galaxy S20 Arbitration Agreement, Plaintiffs argue they were not aware of, and could not have

agreed to, any such contractual terms. Accordingly, the Court must determine whether SEA has demonstrated, without genuine factual dispute, that Plaintiffs validly entered into the Arbitration Agreement.[9]

Federal courts apply principles of state contract law to determine whether a valid arbitration agreement exists. *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 289 (3d Cir. 2017); *Century Indem.*, 584 F.3d at 527. Here, the various Plaintiffs purchased their devices in 13 different states and filed suit against SEA, a New Jersey company, in a federal forum within the State of New Jersey. Before proceeding to analyze the validity of the contract, the Court addresses the issue of which state's substantive law governs. *Frederick v. Law Office of Fox Kohler & Assoc. PLLC LLC*, 852 F. App'x 673, 676 (3d Cir. 2021) (discussing the circumstances under which a choice of law question must be addressed in a case involving enforcement of an arbitration agreement). For a choice of law question to arise, there must be a "true conflict" between the potentially applicable state laws on contract formation. *Id.* (citing *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006)). "A true conflict exists when the application of one or another state's law may alter the outcome of the case." *Id.* (quotation omitted). The parties to this suit have raised no conflict between the law of contract formation in the Plaintiffs' respective home states and the law of the forum state, New Jersey. Indeed, Plaintiffs and SEA both rely in their briefs on New Jersey law. Thus, on this motion to compel arbitration, the Court applies New Jersey contract law to its analysis of whether a valid agreement to arbitrate exists.

---

[9] This analysis concerning enforceability of the Arbitration Agreement does not apply to Plaintiffs Amber and Justin O'Connor. SEA acknowledges they opted out of the Arbitration Agreement in the manner provided by SEA's notice of the right to do so.

Under New Jersey law, an enforceable contract requires offer and acceptance, consideration, a meeting of the minds, and sufficiently definite terms. *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992); *see also Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 116 (3d Cir. 2017) (applying New Jersey contract formation principles to the question of the enforceability of an arbitration agreement related to a consumer product). Applying these principles, the New Jersey Supreme Court has held "if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Weichert Co. Realtors*, 128 N.J. at 435. Plaintiffs and SEA dispute whether the meeting of the minds element, i.e., assent to a contract's terms, is satisfied as to formation of the Arbitration Agreement. Plaintiffs contend that the Galaxy S20 arbitration clause was deliberately hidden by SEA, precluding any notice, understanding, and assent to this term by Plaintiffs, the consumers of the Galaxy S20 phone. They argue that, at best, there is a genuine issue of material fact as to a meeting of the minds, and as such, SEA has failed to carry its burden of demonstrating the existence of an enforceable arbitration agreement.

An "agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law." *Atalese v. U.S. Legal Servs. Grp., L.P.*, 219 N.J. 430, 442 (2014); *see also James v. Global TelLink Corp.*, 852 F.3d 262, 265 (3d Cir. 2017) (applying New Jersey law). Assent to a contract's terms may be manifested expressly, that is, by written or spoken word, or implicitly by conduct. *Weichert Co. Realtors*, 128 N.J. at 436-37; *see also Romanov v. Microsoft Corp.*, No. 21-3564 (FLW), 2021 WL 3486938, at *4 (D.N.J. Aug. 9, 2021). New Jersey law holds that a party may only be found to have "clearly and unambiguously" assented to a waiver-of-rights term if the party has reasonable notice it "is

choosing to arbitrate disputes rather than have them resolved in a court of law." *Atalese*, 219 N.J at 443, 447; *see also Beture v. Samsung Elec. Am., Inc.*, 2018 WL 4621586, at * 5 (D.N.J. July 18, 2018) (holding that a meeting of the minds concerning an arbitration agreement requires reasonable notice of any term waiving the right to litigate in court). However, it is equally well-established under New Jersey law that "[n]o particular form of words is necessary to accomplish a clear and unambiguous waiver of rights," and the arbitration clause "will pass muster when phrased in plain language that is understandable to the reasonable consumer." *Atalese*, 219 N.J. at 443. Applying New Jersey contract law, the Third Circuit has held that for a party to have reasonable notice, the writing must "appear to be a contract" and "be called to the attention of the recipient." *Noble*, 682 F. App'x at 116. In other words, "contractual terms, including an arbitration clause, will only be binding when they are reasonably conspicuous rather than proffered unfairly, or with a design to de-emphasize its provisions." *Id.*

SEA maintains that reasonable notice of the Arbitration Agreement was provided to consumers of the Galaxy S20, including Plaintiffs, in three separate and independently sufficient ways: by express reference on the exterior label of the product box; printed in full in a "Terms and Conditions" pamphlet inside the product packaging; and set forth in accessible onscreen images presented during the device activation process. Each of those locations, SEA argues, called attention to the arbitration clause in a "reasonably conspicuous" manner: using the unambiguous contractual terminology "terms and conditions," expressly advising that such terms included the Arbitration Agreement, and employing bold and/or capitalized fonts to emphasize the notice. SEA underscores that all three locations alerting Plaintiffs to the Arbitration Agreement also provided information concerning the manner in which acceptance of the terms

would be expressed, the right to opt out of arbitration, and the way in which consumers could avail themselves of that right.

Plaintiffs contend that notice of an Arbitration Agreement was not reasonably conspicuous. They do not dispute that the exterior label references both "terms and conditions" and an "arbitration agreement" but point out that these words do not appear at the top of the labeling. Rather, they emphasize, the Arbitration Agreement is mentioned as "the sixth and final item at the end of a long list" and characterize the font used as "tiny." (Opp'n Br. at 13-14.) As to the in-box notice, Plaintiffs maintain that SEA deliberately concealed the "Terms and Conditions" pamphlet in two ways: by failing to specifically identify the Terms and Conditions in a list of "In the Box" contents displayed on the Samsung website and by placing the pamphlet inside a "false top" in the product box, that is, tucked into an interior box nested within the outer box. They criticize the pamphlet placement as designed to not be readily apparent or accessible to a consumer and point out that none of the Plaintiffs saw the material, unless and until specifically directed to it. Plaintiffs argue that SEA cannot meet its burden of demonstrating mutual assent to the Arbitration Agreement because this deliberately obscure design raises a "genuine issue of fact whether a consumer would have encountered an arbitration agreement, let alone agreed unequivocally to it." (Opp'n Br. at 16.)

Plaintiffs further contend that the Galaxy S20 phone's on-screen activation process fails to provide consumers with reasonably conspicuous notice of the Arbitration Agreement given that phones are often activated "by employees at the store where the phone is purchased, not by the customer, as evidenced by the fact that the majority of the Plaintiffs did not set up their own phone." (*Id.*) They argue that the Plaintiffs who did not set up their own phones would not have

encountered the terms and conditions notification, much less expressed their assent. Even as to those customers who do set up their own phones, Plaintiffs further contend, SEA concealed contractual terms by listing terms and conditions on a screen innocuously titled "Check out some info to get started." (*Id.* at 17, n. 14.)

Putting aside, for the moment, the in-box pamphlet and onscreen activation process, the Court finds the information printed on the label of the Galaxy S20 box provided the requisite "reasonably conspicuous" notice to support assent to the Arbitration Agreement between SEA and Plaintiffs. Plaintiffs do not dispute the well-established law concerning "shrinkwrap agreements," where notice of contractual terms is provided on the exterior physical packaging containing the product. In *James v. Global TelLink Corp.*, the Third Circuit described such enforceable arbitration agreements as setting forth contractual terms on or inside the packaging, which consumers are deemed to accept by opening or using the products. *James*, 852 F.3d at 267; *see also Noble*, 682 F. App'x at 117 (recognizing agreements may be formed where cover includes "language indicating that bilateral contractual terms or conditions are inside"). The *James* court noted that binding contracts were found in shrinkwrap agreement cases because consumers "received physical copies of the terms and conditions upon opening the products, and their subsequent use of the products manifested assent to the enclosed terms." *James*, 852 F.3d at 267. Persuasively, the Eleventh Circuit has recognized similar requirements for entering into an enforceable shrinkwrap agreement. *See Dye v. Tamko Bldg. Prods.*, 908 F.3d 675, 681 (11th Cir. 2018). In *Dye*, the court held that a shrinkwrap contract is formed where the product seller provides notice of terms and conditions on the box or wrapping and specifies the conduct that will constitute acceptance of the terms, for example, unwrapping, retaining, or using the product.

*Id.* (affirming decision to compel homeowner plaintiffs to arbitrate dispute against roof shingle manufacturer, where shingle wrappers provided notice of arbitration agreement and opportunity to accept terms of purchase).

Here, the label on the box in which the Galaxy S20 phone was sold contained all the features of valid shrinkwrap agreements. It drew attention to the existence of contractual terms by stating, in bold print: "Packaging Contains . . . Terms and Conditions." More important, and leaving no room for ambiguity, the box label made express reference to an arbitration agreement, provided the location where full terms could be accessed and advised the consumer that certain, identified actions would constitute assent to those terms, all under a capitalized and bold heading reading "IMPORTANT INFORMATION." The label further informs consumers where they may review full terms of the agreement and obtain information about how to opt out. The notice provided is not only conspicuous, but also provides consumers a reasonable opportunity to review the Arbitration Agreement and consider whether to take an affirmative act negating assent to the terms of purchase. Having reviewed the evidence submitted by SEA, including images of the exterior of the Galaxy S20 box, the Court concludes that Plaintiffs' minimization of the notice provided do not withstand scrutiny.

The "Terms and Conditions" pamphlet contained in the Galaxy S20 box provides an additional and independent basis for finding that Plaintiffs had reasonable notice of the Arbitration Agreement. Regarding the adequacy of the notice for purposes of finding mutual assent, the Third Circuit's discussion in *Noble v. Samsung Electronics America* is instructive. *See Noble v. Samsung Elec. Am., Inc.*, 862 F. App'x 113 (3d Cir. 2017). That case involved consumer fraud claims brought as a putative class action by the consumer of an allegedly

defective smartwatch. *Id.* at 114. The defendant supplier of the product had moved to compel arbitration based on an arbitration agreement set forth in a booklet inserted in the product packaging, and the motion was denied by the district court on the grounds that the arbitration clause was unreasonably hidden and thus the agreement was not enforceable. *Id.* at 115. The arbitration clause at issue had been set forth at page 97 of a 143-page booklet, included in the smartwatch packaging, entitled "Health and Safety and Warranty Guide." *Id.* The key issue presented on appeal to the Third Circuit was whether the consumer plaintiff had assented to the arbitration clause set forth in the in-box booklet. *Id*. at 116-17. The Court of Appeals found he had not. *Id*. The Court acknowledged that shrinkwrap agreements, including agreements to arbitrate, can be binding if they are "reasonably conspicuous" and clearly inform consumers they are agreeing to the terms. *Id*. Distinguishing those enforceable agreements, the *Noble* court noted: "Here, the document in which the Clause was included did not appear to be a bilateral contract, and the terms were buried in a manner that gave no hint to a consumer that an arbitration provision was within . . . More particularly, there was no indication on the outside of the Guide that it was a bilateral contract or included any terms or conditions." *Id.* at 116. The court concluded that, under those circumstances, a consumer would have no reasonable notice he was assenting to a bilateral contract, much less an agreement to arbitrate disputes. *Id.* at 117-18.

Here, unlike the situation presented in *Noble*, the Galaxy S20 phone packaging does not bury notice of the Arbitration Agreement within a dense and blandly titled manual. Rather, the Galaxy S20 phone's in-box pamphlet makes the contractual nature of the document obvious and brings the arbitration clause to the forefront. Only six pages long, the pamphlet's cover page identifies it as "Terms and Conditions," words that are unambiguously associated with contracts.

The cover page further advises, in plain language, the "document contains important Terms and Conditions," which will be deemed accepted if the Galaxy S20 phone user opens the package, keeps or uses the phone, or indicates electronic acceptance. As such, it indicates, in plain language that the pamphlet sets forth a bilateral, binding agreement. The document begins at page 1 with notice of the arbitration provision, its binding nature, the location where full terms may be accessed, and the consumer's right to opt out within a reasonable period, all organized under the heading "Important legal information." Moreover, belying Plaintiffs' contention that the pamphlet is concealed because it is tucked into a "false top" or box-within-a-box, the "Terms and Conditions" is expressly identified on the product box's exterior as one of the box's contents. Under such circumstances, a reasonable consumer would be on notice of the "Terms and Conditions" contained in the packaging, and a fairly simple inspection of the box would reveal the written material.[10]

SEA also argues Plaintiffs' assent to the Arbitration Agreement is evident based on completing the Galaxy S20 phone's onscreen setup process, which created what is known as a "clickwrap" agreement. *See ADP, LLC v. Lynch*, No. 16-1111 (WJM), 2016 WL 3574328, at *4 (D.N.J June 30, 2016) (describing a clickwrap agreement as one which provides notice of terms on a computer screen, that is electronically, and then "requires a computer user to affirmatively manifest her asset to the terms of the contract" typically by clicking an icon or dialog box on the screen), *aff'd* 678 F. App'x 77 (3d Cir. 2017). Plaintiffs contest this argument on various

---

[10] Plaintiffs have surmised that, because some of them could not locate the Terms and Conditions insert "even when directed to check," SEA "did not consistently enclose this booklet in all S20 boxes." (Opp'n Br. at 15.) Even assuming some Plaintiffs were unable to locate the pamphlet, the inference drawn by Plaintiffs relies on speculation.

grounds, chief of which is the assertion that many Plaintiffs did not activate their own phones but were provided this service by a salesperson. Clickwrap agreements have been upheld as binding under New Jersey law, including under circumstances like those presented in this case. *See, e.g., Beture*, 2018 WL 4621586, at *6 (holding clickwrap arbitration agreement presented during smartphone activation was enforceable given reasonable notice of terms and conditions provided to all users, "[e]ven when a carrier store representative performed the [smartphone] initialization"); *see also ADP, LLC v. Lynch*, 2016 WL 3574328, at *4-5 (finding the clickwrap agreement, which required a user to acknowledge reading contractual terms incorporated by reference, was enforceable based on the defendants' manifestation of assent by clicking through such acknowledgment, regardless of whether the referenced terms and documents were in fact reviewed). In any event, it is not necessary to decide the parties' arguments concerning the enforceability of the electronic clickwrap agreement because the print materials provided to Plaintiffs with their Galaxy S20 phone purchases establish—independently and certainly in combination—Plaintiffs had reasonably conspicuous notice of contract terms sufficient to support mutual assent to the Arbitration Agreement.

Plaintiffs attempt to raise a genuine issue of fact as to the issue of assent by stating in their respective declarations that they were not aware of the Arbitration Agreement and/or that they did not see any reference to Terms and Conditions on either the outside of the Galaxy S20 phone box or in the pamphlet packaged with the product. Even assuming the truth of those assertions, they do not pertain to a material fact concerning Plaintiffs' assent to the Arbitration Agreement. Assent, or a meeting of the minds, is concerned with whether reasonable notice of a contractual terms was provided, that is, with a party's constructive knowledge of the terms, not

22

with a party's diligence in reading those terms or subjective awareness of them. *Noble*, 682 F. App'x at 116; *ADP v. Lynch*, 2016 WL 3574328, at *5 (rejecting the defendants' argument that a clickwrap agreement was not enforceable because they did not read, and were not forced to review, the contractual terms referenced in the onscreen notice). Indeed, the Third Circuit has held that "[o]nce there is "reasonable notice [of contractual terms], a party is bound by those terms, even if he failed to read them." *Noble*, 682 F. App'x at 116.

In sum, for the reasons discussed, SEA has met its burden of demonstrating it provided reasonably conspicuous notice of the Arbitration Agreement to consumers of the Galaxy S20 phone in two different ways: (1) it advised Plaintiffs in plain language that the phone purchase involved contractual terms, including the Arbitration Agreement, making clear that Plaintiffs would manifest assent by retaining and using their products; and (2) it provided readily available information concerning how to opt-out of the Arbitration Agreement. Thus, as to all but the two Plaintiffs who exercised their right to opt out, SEA has demonstrated the existence of a valid and enforceable Arbitration Agreement. Accordingly, the Court must grant the motion to compel arbitration.

### C.    SEA's Motion to Stay the Action as to the Opt-Out Plaintiffs

While SEA concedes Plaintiffs Amber and Justin O'Connor are not bound by the Arbitration Agreement, and are therefore entitled to litigate their claims, it requests a stay of this entire action pending arbitration of the other Plaintiffs' disputes. SEA asserts, without elaboration, that a stay is required under the FAA, 9 U.S.C. § 3. Yet, in this case, the statute requires no such thing. Section 3 provides "a court may compel a party to arbitrate *where that party has entered into a written agreement to arbitrate that covers the dispute*." 9 U.S.C. § 3

23

(emphasis added). The mandatory stay does not apply to parties who have not agreed to arbitrate, even when those parties, as is the case with the O'Connors, are joined together in the same lawsuit with parties who are bound by an arbitration agreement. *Mendez v. Puerto Rican Int'l Cos. Inc.*, 553 F.3d 709, 712 (3d Cir. 2009). Rather, the decision to stay the claims of non-arbitrating parties rests within a court's discretion. *Id.* (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983)

      SEA also argues that staying the entire action, that is, the non-arbitrable claims, will promote judicial economy, given the strong likelihood that resolution of the arbitrable disputes will impact if not simplify the litigation. In this regard, SEA emphasizes this lawsuit was filed as a putative class action, and thus Plaintiffs themselves have alleged that all claims share common questions of law and fact. The opt-out Plaintiffs, however, argue a stay would be prejudicial to their right to pursue this civil action and emphasize that gains to judicial economy are minimal, because SEA would nevertheless have to litigate the claims by opt-out Plaintiffs, who could not be bound by any arbitration decision.

      The Court may stay a case as a discretionary matter of docket control. *Landis v N. Am. Co.*, 299 U.S. 248, 254-55 (1936); *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 818 (3d Cir. 1982) ("matters of docket control and conduct of discovery are committed to the sound discretion of the district court."). Determining whether a stay is appropriate requires the Court to weigh the parties' competing interests and balance their relative hardships. *Landis*, 299 U.S. at 254-55; *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983). This analysis is informed by several factors, including: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in

question and trial of the case; and (3) whether discovery is complete and a trial date has been set." *Eagle View Tech., Inc. v. Xactware Solutions, Inc.*, No. 15-7025 (RBK), 2016 WL 7165695, at *3 (D.N.J. Dec. 7, 2016). The burden falls on the party requesting a stay of proceedings to "make out a clear case of hardship or inequity in being required to go forward." *Landis,* 299 U.S. at 255.

Arguing a stay is appropriate here, in the Court's discretion, SEA cites decisions issued by other district courts concluding that a stay of all claims pending arbitration is appropriate "even if only some of the claims will be arbitrated." *In re Samsung Galaxy Smartphone Mktg. and Sales Practices Litig.*, 298 F. Supp. 3d 1285, 1304 (N.D. Cal. 2018) (citing numerous decisions by district courts in the various Districts of California); *see also Hikers Indus., Inc. v. William Stuart Indus. (Far East) Ltd.*, 640 F. Supp. 175, 177 (S.D.N.Y. 1986) (staying the action pending arbitration between some of the parties because a stay would serve judicial economy, and noting many federal courts have granted stays where some but not all defendants must arbitrate). Courts have reasoned that "a stay of all claims is particularly warranted in the class-action context because the complaint admits that common question of fact and law predominate." *Samsung Galaxy Smartphone Litig.*, 298 F. Supp. 3d at 1304 (citing cases). The Supreme Court has observed that, where a case involves both arbitrable and non-arbitrable claims, "it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20 n.23. However, the Court did not elaborate on the circumstances that would militate in favor of a stay but rather noted it was a matter for the district court's discretion. *Id.*

This Court is not persuaded by SEA's argument. The mandatory stay of FAA Section 3 does not apply to the non-arbitrating Plaintiffs, the O'Connors. SEA's request that the Court, in its discretion, stay the entire action pending arbitration essentially seeks to bring the O'Connors' claims within the scope of the FAA's mandatory stay, simply because they filed this lawsuit together with others who are bound by the Arbitration Agreement. The sole reason offered by SEA for delaying litigation of the O'Connors' claims is judicial economy, relying on Plaintiffs' own assertions that this putative class action involves substantially similar questions of law and fact across claims. Simplification of issues and the possibility that another proceeding may affect a case are indeed both factors the Court may consider in determining whether a stay is appropriate. *Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*, 544 F.2d 1207, 1215 (3d Cir. 1976) ("In the exercise of its sound discretion, a court may hold one lawsuit in abeyance to abide the outcome of another which may substantially affect it or be dispositive of the issues."). However, SEA has not demonstrated that the impact of the arbitration proceedings on the claims of the non-arbitrating Plaintiffs would be more than minimal in this case. As Plaintiffs note in their opposition, the O'Connors will not be bound by any outcome of arbitration proceedings in which they did not participate, under ordinary principles of collateral estoppel. *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (holding that, for collateral estoppel to apply, it is essential that "the party being precluded from relitigating the issue was fully represented in the prior action."). The simplification of legal and factual issues is not evident here. Moreover, the Court must consider the strong interests of the O'Connors in litigating their claims. These Plaintiffs validly opted out of the Arbitration Agreement and as such have a right to proceed with a civil action against SEA. A stay of their

26

claims while others engage in arbitration against SEA would delay the O'Connors from pursuing relief, impact their right to litigate, and work a clear disadvantage on them.

Thus, weighing the parties' competing interests, the Court finds, in its discretion, that a stay of the entire action is not appropriate. Pursuant to Section 3 of the FAA, the action must be stayed as to the claims brought by the Plaintiffs who are bound by the Arbitration Agreement. However, for the foregoing reasons, the Court denies SEA's motion insofar as it seeks to stay the claims brought by Plaintiffs who opted out of that agreement.

## III.   CONCLUSION

SEA's motion to compel arbitration is granted. Its motion to stay the action is granted insofar as it pertains to the claims of Plaintiffs compelled to arbitrate and denied as to the claims brought by the Plaintiffs who have opted out of the Arbitration Agreement. A separate Order will be filed together with this Opinion.

  /s/ *André M. Espinosa*
ANDRÉ M. ESPINOSA
United States Magistrate Judge

Dated:  November 29, 2021